# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF NORTH CAROLINA
### CHARLOTTE DIVISION
### 3:15-cv-420-FDW
### (3:09-cr-39-FDW-5)

MICHAEL GREENE,                         )
                                        )
                    Petitioner,         )
                                        )
vs.                                     )                    ORDER
                                        )
UNITED STATES OF AMERICA,               )
                                        )
                    Respondent.         )
_____ )

**THIS MATTER** is before the Court on Petitioner's Motion to Vacate, Set Aside or Correct

Sentence under 28 U.S.C. § 2255. (Doc. No. 1). Also pending are Petitioner's "Motion to

Amend/Correct Motion to Vacate/Set Aside/Correct Sentence," (Doc. No. 5), and Petitioner's

"Notice of Exhibit and Motion to Supplement," (Doc. No. 24).

## I.    BACKGROUND

### A. Petitioner is charged with drug conspiracy and conspiracy to commit Hobbs Act robbery.

After the Federal Bureau of Investigation ("FBI") investigated drug trafficking along the

Beatties Ford Road corridor of Charlotte, North Carolina, Petitioner Michael Greene was

identified as a member of the area's largest drug-trafficking conspiracy, led by Jason Campbell.

(Crim. Case No. 3:09-cr-39-FDW-5, Doc. No. 429 at ¶¶ 51-52, 56: PSR). Officers also learned

that Petitioner, Campbell, Jawaad Nash, and other co-conspirators were planning to rob another

drug dealer of drugs and money while he was not home, but while his girlfriend and minor

children were present. (Id. at ¶¶ 57-60). In April 2009, Petitioner was charged in a superseding

indictment with conspiracy to distribute 50 grams or more of cocaine base and 500 grams or more of cocaine, in violation of 21 U.S.C. §§ 841, 846 (Count One), and conspiracy to commit Hobbs Act robbery, in violation of 18 U.S.C. § 1951 (Count 26). (Id., Doc. No. 114: Superseding Bill of Indictment). Petitioner was arrested in October 2009, and attorney Peter Anderson was appointed to represent him. (Id., Doc. No. 239). Anderson and the Government engaged in plea negotiations, and a tentative plea deal was offered to Petitioner while he was represented by Anderson, but the deal was never finalized. See (Id., Doc. No. 271).

Anderson was allowed to withdraw as counsel on November 16, 2009. See (Id., Doc. Nos. 264, 271). Petitioner requested to proceed pro se; the Government noted that Petitioner needed standby counsel given the discovery in the case, which included wiretap evidence; and the Court appointed Kenneth Snow as standby counsel on November 20, 2009. (Id., Doc. No. 264 at 55-56, 67, 73-74; Doc. No. 257).

Due to Petitioner's pro se status, the Government filed a motion for the alternative production of discovery, noting that there was a substantial amount of electronic evidence, including telephone wiretaps, and that the Mecklenburg County jail did not have appropriate technology to allow Petitioner to review the electronic evidence. (Id., Doc. No. 256). Thus, the Government suggested producing the discovery to standby counsel, who could then share it with Petitioner in a manner consistent with the jail's security procedures. (Id.). This motion was sent to both Petitioner as a pro se party and to Snow as his standby counsel. (Id. at 7). The Court granted this motion. (Id., Doc. No. 263).

Snow was terminated as standby counsel on January 4, 2010, and M. Victoria Jayne was appointed to represent Petitioner as lead counsel on January 7, 2010. (Id., Doc. No. 274). Jayne talked to Petitioner about entering into plea negotiations with the Government, but Petitioner

refused to plead to the indictment and sought a guaranteed number of years. (Civ. Doc. No. 11-1 at ¶ 7: Jayne Aff.). On January 20, 2010, Petitioner told Jayne he would not agree to plead guilty. (Id.). Before trial, Jayne and investigator Dan Carlsen, who was also appointed to assist Petitioner, reviewed all of the wiretaps received from the Government. (Id. at ¶ 3). Jayne states in an affidavit that she reviewed the wiretap orders but she did not file a motion to suppress the wiretaps because there was no non-frivolous basis for doing so. (Id. at ¶ 4). Jayne met with Petitioner on several occasions to discuss the discovery. During these visits, Jayne read Petitioner the statements of codefendants, as well as police reports, which referred to the contents of the wiretap calls. (Id. at ¶ 5).

On January 27, 2010, Jayne and Carlsen met with Petitioner to play the wiretap calls. When Carlsen started to play the first disk, Petitioner began to curse and yell and refused to listen. (Id. at ¶ 6). Although he was told he needed to listen to the calls, which were very incriminating, Petitioner refused to listen and announced that he was lead counsel in the case. (Id.). Jayne then filed a motion for inquiry into status of counsel, which was denied. (Id. at ¶ 2).

**B. Petitioner chooses to try his case pro se.**

On February 8, 2010, the date the trial was scheduled to begin, Petitioner refused to meet with Jayne, refused to dress out of his jail clothes, and disrupted the courtroom to the point that he was removed. (Id. at ¶ 8). In light of the disruptions, jury selection was postponed until the following day. In reviewing the representation issue when proceedings resumed on February 9, this Court stated that defense counsel had "very thoroughly reviewed the evidentiary record in the U.S. Attorney's open file. She's filed a series of motions with regard to all that evidence," and she "has worked very, very vigorously on your behalf." (Crim. Case No. 3:09-cr-39-FDW-5, Doc. No. 584 at 107: Trial Tr. II). Even Petitioner stated, "I'm not saying she is ineffective."

(Id. at 109).  Petitioner then stated his intention to proceed pro se, and the Court directed Jayne to proceed as standby counsel.  (Id. at 111).  Petitioner represented himself throughout voir dire and the Government's case.  However, during cross-examination of the last government witness, he removed himself from the courtroom, and Jayne stepped in to represent him.  (Id., Doc. No. 586 at 259-60: Trial Tr. IV).

### C.  Numerous witnesses testify about Petitioner's cocaine transactions and his involvement in planning the robbery of another drug dealer.

The evidence at trial showed that, beginning at least as early as 2004, Petitioner regularly engaged in crack and powder cocaine transactions, often buying dealer-quantities of crack from co-defendants Campbell and Nash.  Campbell testified that he regularly brought three to four kilograms of powder cocaine from Atlanta to Charlotte.  (Id., Doc. No. 591 at 42-45: Trial Tr. III aft.).  Campbell would cook his own crack from the powder cocaine he bought.  (Id. at 65).  He stated that he began selling Petitioner cocaine in 2004, that the least amount he sold Petitioner was 3.5 grams of crack, and that the largest amount of powder cocaine he sold Petitioner was half a kilogram.  (Id. at 71-72).  Campbell also testified that Nash had sold cocaine to Petitioner in quantities of at least 3.5 grams.  (Id., Doc. No. 586 at 11).  James Vaughn, who worked with Campbell, testified that he made approximately 20 deliveries of crack cocaine to Petitioner and that each delivery was at least 7 grams.  (Id. Doc. No. 584 at 326-27).  Vaughn testified that he also witnessed over ten drug transactions between Campbell and Petitioner.  (Id. at 328).  Felicia Baucum, Nash's girlfriend, testified that she participated in transactions between Petitioner and Nash beginning in 2007 that involved 14 grams and 7 grams of crack cocaine.  (Id. at 260-61, 274-78, 283-87).  She also testified that Petitioner had "flexed" her friend by selling her fake cocaine.  (Id. at 279).

Clement Hope testified that he bought two ounces (56 grams) of powder cocaine from Petitioner in 2006 after Petitioner received a settlement payment.  (Id., Doc. No. 585 at 418: Trial Tr. III).  He testified that he was with Petitioner in 2003, when Petitioner bought half an ounce (14 grams) of crack cocaine from Sanchez Hudson.  (Id. at 426-27).  Hope also saw Petitioner sell an ounce (28 grams) of crack cocaine to a man named Rico.  (Id. at 433).  Finally, Hope testified to Petitioner's involvement in robbing other drug dealers, including a robbery in which a kilogram of cocaine was stolen.  (Id. at 422, 427-31, 434-35).  Another witness, Malik Billings, testified that he sold Petitioner half an ounce of powder cocaine and that Petitioner sold him the same amount on another occasion.  (Id., Doc. No. 586 at 206-07).  Thus, witnesses testified to Petitioner's direct involvement with over 227.5 grams of crack cocaine and 1,584 grams of powder cocaine, well above the 50 grams of crack and 500 grams of powder charged in the indictment.

Campbell also testified that he, Petitioner, Nash, and Gary Crockett had planned to rob another drug dealer, that he had driven by the house more than five times casing it, and that he knew that the dealer, his girlfriend, and some children lived there.  (Id., Doc. No. 591 at 81-82, 86-95).  According to Campbell, the dealer was selling kilograms of cocaine and had another business, so they intended to steal drugs and money from his home by arming themselves with firearms and kicking in the door.  (Id. at 97-98, 111-12, 123-24, 134).  Campbell testified that Petitioner was trying to get his girlfriend to rent a car so they could use it for the robbery since Petitioner had just been pulled over by the police while driving his own car.  (Id. at 124-27).  He also testified that Petitioner discussed getting some teenage boys (aged 15 to 17) to go into the house with guns to commit the robbery, while Petitioner and Campbell waited around the corner. (Id. at 136-39).

**D. Petitioner's involvement in cocaine transactions and planning the robbery is corroborated by his own words and those of his co-defendants as captured on the wiretaps.**

The jury heard twenty-five wiretapped phone calls, consisting mostly of conversations between Petitioner and Campbell and Petitioner and Nash.  See (Id., Doc. No. 585 at 507-17 (Gov. trial exs. 5w-5y); Doc. No. 591 at 50-69, 80-139 (Gov. trial exs. 5a-5t); Doc. No. 586 at 18-29 (Gov. trial exs. 5s-5v).  During the conspiracy, Petitioner expressed concerns about wiretapping, as Campbell testified that Petitioner was concerned that Nash's phone was being tapped because on one occasion the police were waiting for Petitioner when he was trying to deliver a firearm to Nash.  (Id., Doc. No. 591 at 53, 61-62).  Campbell testified to the circumstances of the calls and explained terms he and the co-conspirators used.  For instance, "quake" referred to seven grams of cocaine and "work" referred to cocaine.  (Id. at 63).  Campbell testified that in one of the conversations Petitioner was asking him for seven grams of crack cocaine.  (Id.).  In another conversation, the two discussed getting pulled over by the police, noting that another officer, who was driving a Trailblazer, had pulled in front of them. (Id. at 117-20).

Petitioner and Campbell also discussed their plans to rob the drug dealer on a number of occasions.  In a wiretap from January 23, 2009, Petitioner stated that he had "just now cut by" the drug dealer's house, and that the drug dealer's car was not there, but that his girlfriend was working on another car that was in the driveway.  (Id. at 129-31).  Petitioner stated, "Yep and I know that bitch ain't going to buck, cause I seen the little boy standing in the door."  (Id. at 132).  Campbell stated, "She know where them key's at, don't she," and Petitioner replied, "She can put us in the direction, you know what I'm saying?"  (Id. at 133-34).

### E. The 2007 traffic stop and Kevin Mullis's testimony

North Carolina state trooper Mark Stewart testified that on May 25, 2007, he stopped Petitioner for speeding on U.S. 74 east of Lilesville. (Id., Doc. No. 586 at 136-39). Lilesville police chief Kevin Mullis responded to Stewart's call for backup. (Id. at 138-39, 142-43). When Mullis arrived, Petitioner was in the driver's seat of a white Ford Expedition. (Id. at 143-44). Jawaad Nash, Eric Sutton (who stated that his name was Derick Dion Mason),[1] and Eugene Langley (also known as "Lang") were also in the car. (Id. at 145).

Two other law enforcement officers also came to the scene, and Anson County Sheriff's Deputy James Christopher Walker assisted Mullis in searching the vehicle. (Id. at 145-46). Walker showed Mullis an off-white rocky substance that was scattered around the front seat area. (Id. at 146). At trial, Mullis testified that it appeared to be crack cocaine that had been ground up. (Id.). Mullis collected the evidence and marked it as item 1. (Id. at 147: Gov. trial ex. 28A). When Mullis opened the trunk, Petitioner yelled, "Anything you find in there is mine." (Id.). Mullis found a black duffel bag in the trunk containing clothes and a plastic baggie containing an off-white rocky substance that, along with a cutting tool, had been shoved inside a shoe. (Id. at 148-49). Mullis testified that he and Walker both thought the substance appeared to be crack cocaine. (Id. at 149-50). Mullis testified that the substance weighed 31 grams and that he marked it as item 3. (Id. at 150: Gov. trial ex. 28B).

Mullis testified that he collected the evidence, placed it in a secure evidence storage at the Lilesville Police Department, and on May 30, 2007, he sent it to the North Carolina State Bureau

---

[1] He was identified through pictures as Eric Sutton, also known as "Little E." (Id. at 14, 145, 203).

of Investigation ("SBI") Laboratory for testing.  (<u>Id.</u> at 151).  Mullis also identified the box in which he sent the drugs for testing, noting that it had been resealed and returned to him by the lab.  (<u>Id.</u> at 151-53).

### F.  The SBI tests the substances found in the search.

Jennifer Lindley, a forensic chemist with the SBI, testified that she recognized Government exhibits 28A and 28B as items she received and tested.  (<u>Id.</u> at 163-64).  Lindley testified that she ran five tests on the substance in Exhibit 28A, which weighed .9 grams, and that in her opinion it contained cocaine.  (<u>Id.</u> at 165-68).  Because other things were mixed with the substance, she could not determine whether it was crack cocaine or powder cocaine.  (<u>Id.</u> at 168-69).  Lindley testified that the same testing revealed that no controlled substances were present in Exhibit 28B (the 30.6 gram sample).  (<u>Id.</u> at 170-71).

### G.  Mullis's testimony regarding the traffic stop is corroborated by other witnesses.

Campbell testified that Sutton had told him about getting pulled over while driving to Myrtle Beach with Petitioner.  (<u>Id.</u> at 13-15).  He stated that Petitioner had some fake dope and had started to eat it when they got pulled over.  (<u>Id.</u> at 15).  Sutton told Campbell that Nash and Lang were also in the car when it was pulled over.  (<u>Id.</u>).  Malik Billings also testified to the stop, stating that he had to pick up his cousin (Sutton), Lang, and Nash, after Petitioner was pulled over for speeding on his way to Myrtle Beach, and the police found flex in the car.[2]  (<u>Id.</u> at 202-**04).**

### H.  Petitioner becomes disruptive, and Jayne steps in as defense counsel.

---

[2]  As the Court discusses, <u>infra</u>, based on the traffic stop, Petitioner was convicted in North Carolina state court of misdemeanor possession of drug paraphernalia in March 2008 and was sentenced to 32 days of confinement, but the state court conviction was later vacated.

Petitioner left the courtroom during his cross-examination of Billings, and Jayne stepped in as counsel.  (Id. at 259-60).  The only remaining Government witness was Steven Parker, a Charlotte-Mecklenburg police officer, who testified that he was the person driving the Trailblazer referred to on the wiretap.  (Id. at 271-72).  The defense called two witnesses, but Petitioner did not testify.  (Id., Doc. No. 611: Trial Tr. V).  Mullis's testimony was not mentioned during closing arguments, but was referred to on rebuttal in response to the defense's argument that Petitioner was a bystander to the conspiracy.  The Government argued that a bystander to a drug conspiracy would have no reason to have flex in his car.  See (Id. at 265-67).

Petitioner was convicted of both counts as charged in the superseding indictment.  (Id. at 281-83).  He was sentenced to life imprisonment on Count One and to 240 months of imprisonment on Count 26, based on the Court's finding that there was a need to protect the public and that his offense was "a very dangerous, very violent drug trafficking conspiracy, and [Petitioner] was a key part of it" and he "really has no respect for law, and the defendant really has little or no respect for the lives of others."  (Id., Doc. No. 588 at 197, 201, 204: Tr. of Motion to Recuse, Motion to Strike, and Sentencing Hearing).[3]

## I. Petitioner appeals and, while his appeal is pending, the Government discovers that two exhibits from trial are missing.

Petitioner, represented by James B. Craven, III, appealed his conviction.  Although counsel filed an Anders brief, he requested the Court to consider the sufficiency of the evidence, ineffective assistance of counsel, and United States v. Simmons, 649 F.3d 237 (4th Cir. 2011) (en banc).  United States v. Greene, 513 F. App'x 300, 301 (4th Cir. 2013).

---

[3] Petitioner filed a motion for a new trial based on alleged deficiencies in the SBI lab that tested the physical evidence and the credibility of a witness who secured DNA evidence.  (Id., Doc. No. 524).  This motion was denied in March 2011 after a hearing.  (Id., Doc. No. 588 at 55-60).

In late April 2012, while Petitioner's appeal was pending, the SBI informed Assistant United States Attorney ("AUSA") Kelli Ferry that it had opened an investigation of Government witness Kevin Mullis with respect to missing evidence. (Crim. Case No. 3:09-cr-39-FDW-5, Doc. No. 712 at 5). Over the next month, the Government received updates on the status of the SBI's investigation. (Id.). The SBI's investigation revealed that on or about January 2011, Mullis accepted a new position as Chief of Police of Polkton, North Carolina. However, he remained with the Lilesville police department until about February 2011 to assist with the transition. (Id.). At this time, Mullis had the only key to the Lilesville police department evidence room, and he removed a box of evidence. Although the new Lilesville police chief repeatedly asked Mullis to return the key, Mullis did not do so until March 22, 2012. (Id.). When the evidence room was inventoried at that time, it was discovered that Government exhibits 28A and 28B from Petitioner's trial were missing, as were drug exhibits from another case, the evidence log for 2010, and $2,332 in cash. (Id. at 6).

Mullis failed a polygraph examination regarding the missing money and drug-related exhibits. (Id.). He subsequently admitted to the SBI that a few weeks after he removed a box of evidence from the Lilesville police department, he converted the $2,332 to his personal use. With respect to the missing exhibits from Petitioner's trial, Mullis maintained that he had placed those exhibits in a locked cabinet in the Lilesville Town Hall. (Id. at 6-7). That cabinet was moved during the personnel transition, and the exhibits have not been located. On June 5, 2012, the Government disclosed this information to Petitioner's counsel and to the Court. (Civ. Doc. No. 1 at 27-28).

**J. Petitioner moves for a new trial based on the missing evidence.**

On June 21, 2012, Petitioner filed a pro se motion for a new trial based on this new evidence. (Crim. Case No. 3:09-cr-39-FDW-5, Doc. No. 642: Motion for New Trial). He alleged that Mullis had testified falsely regarding the substance he found in Petitioner's car during the traffic stop, that it was prosecutorial misconduct to allow Mullis to present this testimony at trial, and that the evidence had been improperly destroyed. (Id.). He argued that he had met the five-part test in United States v. Bales, 813 F.2d 1289, 1295 (4th Cir. 1987), for obtaining a new trial. (Id. at 6).

In early March 2013, the Fourth Circuit decided Petitioner's appeal. The Court held that the issues raised in Petitioner's pro se supplemental appellate brief lacked merit. United States v. Greene, 513 F. App'x at 302. The Fourth Circuit found that there was "more than sufficient evidence" of Petitioner's guilt and affirmed his convictions. Id. However, the Court vacated his life sentence because the Fair Sentencing Act was held to apply to offenders sentenced after its effective date for conduct that occurred before its enactment. Id. The Fourth Circuit noted that Petitioner's ineffective assistance of counsel claim was not cognizable on direct appeal and took no position on the issue of newly discovered evidence, finding that it was appropriate for the district court to address those issues first. Id. at 302 & n.3.

**K.  After Petitioner's appeal is decided, the Government learns that Kevin Mullis was investigated after a murder committed by his brother in 2000.**

Later in March 2013, the Government learned that Mullis had been investigated with respect to his brother, E. Scott Mullis's, murder of a woman in November 2000. (Crim. Case No. 3:09-cr-39-FDW-5, Doc. No. 712 at 7-8). Mullis had contacted the Anson County Sheriff's Office to report that his brother had confessed to the murder and had attempted to get him to lie to cover up the murder. (Id. at 8). Mullis admitted to burning the pants and shoes worn by his

brother during the murder, and to lending a pistol to his brother (though there is no evidence it was obtained for the purpose of harming the woman), and lending him money to buy a pellet gun.  (Id.).  Mullis cooperated with authorities and recorded an incriminating conversation with his brother.  (Id. at 9).  Mullis was not charged with a crime, but his brother was convicted of murder.  (Id.).  Mullis became a law enforcement officer in 2004 and did not report his involvement in the murder investigation when questioned during pre-trial preparation about Giglio information.  (Id.).  The Government filed a response to Petitioner's motion for a new trial, noting that the murder investigation information was not included in the motion for a new trial, but addressing this information as a matter of efficiency.  (Id. at 7).

On October 7, 2013, this Court heard arguments regarding the motion for a new trial. The Court denied the motion, finding that the exclusion of Mullis's testimony and the evidence from the traffic stop would have had "no impact on the jury" in light of the overwhelming evidence of Petitioner's guilt.  (Id., Doc. No. 732 at 41).  A letter from Mullis's attorney was admitted, which stated that Mullis would have invoked the Fifth Amendment had he been called to testify regarding the missing evidence though his testimony would have been consistent with the statements he previously made.  An affidavit from SBI Investigator Audrey Bridges was also admitted, stating that she did not inform the Government of the murder investigation until March 2013.  (Id. at 25-26).  The defense admitted that the Government had disclosed the information regarding the murder investigation "very, very quickly" and that there had been "no undue delay."  (Id. at 42).

For purposes of deciding the motion for a new trial, this Court assumed that the evidence was impeaching and that "the jury would have discredited [Mullis's] testimony as a whole."  (Id. at 38).  The Court held that there was insufficient evidence to make a finding of good faith or bad

faith with regard to the missing evidence.  (Id. at 29-32).  The Court found that the evidence was cumulative, because there was overwhelming evidence of Petitioner's guilt, as shown by the testimony of other co-conspirators and law enforcement officers, as well as the wiretaps in which Petitioner incriminated himself.  (Id. at 39-40).  The Court stated:

> On page 4 of the slip opinion the Fourth Circuit said, quote, "There was more than sufficient evidence showing that Greene voluntarily agreed to engage in a conspiracy to distribute drugs and to commit a robbery."  Close quote.
> So the Fourth Circuit said there was more than sufficient evidence.  So this was not a close call at all.  There were numerous law enforcement officers testifying.  There were numerous co-conspirators testifying as eyewitnesses.  There was the defendant testifying in the wiretaps.  The wire information evidence in this case was just overwhelming.

(Id.).  This Court determined that "you can extract all of Mr. Mullis's testimony from this trial, you can take out the exhibits he introduced, and it could not have swayed the jury because it was such overwhelming evidence in this case."  (Id. at 41).  The Court also found that Mullis's testimony was irrelevant to the Hobbs Act robbery count.  (Id. at 40-41).  The Court held that there was no evidence of prosecutorial misconduct and that there was no evidence to support Petitioner's assertion that the evidence from the traffic stop was planted.  (Id. at 41-43).  The Court therefore denied the motion for a new trial, and Petitioner's subsequent motion for reconsideration was also denied.  (Id., Order dated Jan. 10, 2014).

**L.  Petitioner is resentenced and again appeals.**

Petitioner was resentenced to 480 months of imprisonment on Count One.  (Id., Doc. No. 734: Amended Judgment).  He appealed, and John C. Fisher was appointed to represent him. (Id., Doc. No. 740).  On appeal, Petitioner argued that his sentence was unreasonable and that this Court erred by denying his motion for a new trial without holding an evidentiary hearing. United States v. Greene, 581 F. App'x 280 (4th Cir. 2014) ("Greene II").  The Fourth Circuit

affirmed, finding that, based on this Court's familiarity with the trial evidence and the grounds asserted in the motion for a new trial, there was no abuse of discretion.  Id. at 282.

Petitioner timely filed the present motion to vacate on September 9, 2015, and he filed a motion to amend on December 10, 2015.  (Civ. Doc. Nos. 1, 5).  Petitioner contends that he received ineffective assistance of trial and appellate counsel, that there was prosecutorial misconduct, and cumulative error.  The Government filed a Response on January 12, 2016.  On January 25, 2016, Stacey Dawn Rubain filed a notice of appearance as Petitioner's counsel, but on April 4, 2016, the Court granted Rubain's motion to withdraw as counsel.  (Civ. Doc. Nos. 10, 18, 19).  On June 6, 2016, Petitioner filed a pro se Reply.  (Civ. Doc. No. 23).  On July 1, 2016, he filed a "Notice of Exhibit and Motion to Supplement," attaching as an exhibit records showing that a prior North Carolina conviction had been vacated because it was related to an investigation involving Kevin Mullis and allegations that Mullis had planted evidence to secure Petitioner's state court conviction.  (Civ. Doc. No. 24).  On December 21, 2016, the Government filed a Response.  (Civ. Doc. No. 26).  This matter is therefore now ripe for disposition.

## II.     STANDARD OF REVIEW

Rule 4(b) of the Rules Governing Section 2255 Proceedings provides that courts are to promptly examine motions to vacate, along with "any attached exhibits and the record of prior proceedings . . ." in order to determine whether the petitioner is entitled to any relief on the claims set forth therein.  After examining the record in this matter, the Court finds that the arguments presented by Petitioner can be resolved without an evidentiary hearing based on the record and governing case law.  See Raines v. United States, 423 F.2d 526, 529 (4th Cir. 1970).

The Court notes that, in addition to seeking an evidentiary hearing, Petitioner also requests appointment of counsel and an order from the Court requiring AUSA Ferry to take a

polygraph test. (Civ. Doc. No. 1 at 18-19). These requests are denied. There is no right to counsel in a § 2255 proceeding, and Petitioner, who generally has indicated a preference for proceeding pro se, has failed to show that the "interests of justice" require that he be appointed counsel.[4] See Pennsylvania v. Finley, 481 U.S. 551, 555 (1987); 18 U.S.C. § 3006A(a)(2)(B); United States v. Riley, 21 F. App'x 139, 141 (4th Cir. 2001). Furthermore, to the extent that Petitioner seeks discovery in the form of an order by the Court requiring AUSA Ferry to take a polygraph test, Petitioner simply has not made an adequate showing that such discovery is warranted. See United States v. Roane, 378 F.3d 382 (4th Cir. 2004).

### III. DISCUSSION

#### A. Petitioner's claims of ineffective assistance of trial counsel

The Sixth Amendment to the U.S. Constitution guarantees that in all criminal prosecutions, the accused has the right to the assistance of counsel for his defense. See U.S. CONST. amend. VI. To show ineffective assistance of counsel, Petitioner must first establish a deficient performance by counsel and, second, that the deficient performance prejudiced him. See Strickland v. Washington, 466 U.S. 668, 687-88 (1984). In making this determination, there is "a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." Id. at 689; see also United States v. Luck, 611 F.3d 183, 186 (4th Cir. 2010). Furthermore, in considering the prejudice prong of the analysis, the Court "can only grant relief under . . . Strickland if the 'result of the proceeding was fundamentally unfair or unreliable.'" Sexton v. French, 163 F.3d 874, 882 (4th Cir. 1998) (quoting Lockhart v. Fretwell, 506 U.S. 364, 369 (1993)). Under these circumstances, the petitioner "bears the burden of

---

[4] Moreover, as noted, Petitioner obtained counsel to represent him after he filed his petition pro se, but counsel subsequently withdrew as counsel.

affirmatively proving prejudice." Bowie v. Branker, 512 F.3d 112, 120 (4th Cir. 2008). If the petitioner fails to meet this burden, a "reviewing court need not even consider the performance prong." United States v. Rhynes, 196 F.3d 207, 232 (4th Cir. 1999), opinion vacated on other grounds, 218 F.3d 310 (4th Cir. 2000).

1. **Petitioner's contention that trial counsel provided ineffective assistance by failing to move to suppress all wiretap recordings and to request a suppression hearing, or to move in limine to suppress "non-relevant and prejudicial sections" of the recordings.**

Petitioner first argues that trial counsel Jayne provided ineffective assistance by failing to move to suppress all wiretap recordings and to request a suppression hearing, or to move in limine to suppress "non-relevant and prejudicial sections" of the recordings. (Civ. Doc. No. 1 at 5; Civ. Doc. No. 5-1 at 1-4). He contends that counsel failed to listen to all of the wiretap recordings and that this prejudiced him because the recordings contained racial slurs and incriminating evidence that affected the jurors' ability to render an impartial verdict. (Civ. Doc. No. 1 at 5). He argues that he used the words "cracker(s)" and "nigger(s)" several times on the recordings and that most of the jurors "would most likely feel" offended by the use of these words. (Civ. Doc. No. 5-1 at 2). He also claims that the Government used the word "cracker" to create bias in the jury. (Id. at 3).

Petitioner's allegation that his attorney did not listen to the wiretap evidence is speculative and unsupported. See United States v. Dyess, 730 F.3d 354, 359-60 (4th Cir. 2013) (holding it was proper to dismiss § 2255 claims based on vague and conclusory allegations), cert. denied, 135 S. Ct. 47 (2014). Moreover, as Jayne's affidavit shows, she listened to the wiretap evidence, read Petitioner statements from codefendants and police reports that referenced the

wiretaps, told him he needed to hear the wiretap evidence, and arranged for a contact visit with him before trial to play the wiretap evidence for him. (Civ. Doc. No. 11-1 at ¶¶ 5-6).

Petitioner also cannot show that counsel was deficient because he does not identify a basis on which the wiretaps could have been suppressed. Moreover, Jayne asserts in her affidavit that she found no nonfrivolous basis for making such motion. (Id. at ¶ 4). Although Petitioner asserts that the wiretaps should have been suppressed based on the references to "cracker" and "nigger," the evidentiary value from the wiretaps, which showed Petitioner asking for drugs and preparing to break into a house with guns to steal drugs and money, substantially outweighed the danger of unfair prejudice from the language that Petitioner and his co-conspirators used while participating in the offense conduct. See FED. R. EVID. 403; United States v. Mohr, 318 F.3d 613, 618-20 (4th Cir. 2003) (recognizing that the damage to a defendant's case from the legitimate probative force of evidence is not unfair prejudice); Williams v. Wheeler, No. 7:06cv539, 2007 WL 495325, at *2 (W.D. Va. Feb. 9, 2007) (unpublished) (holding that counsel was not deficient for failing to move to suppress defendant's statements in which she cursed the victim, said she hoped that the victim died, and discussed how she stabbed the victim because these statements were not unfairly prejudicial). Moreover, these words were not used on all of the wiretaps admitted at trial and, where used, they often referred to specific people. Thus, as the Government points out, the references could not be removed without changing the content of the conversations or causing confusion.

Moreover, Petitioner's assertion that this language was prejudicial is unsupported. He merely speculates that this may have offended the jurors, but he presents no evidence that he was convicted for using bad language. The harm to Petitioner came from the content of the wiretaps, not the nature of the language he and his co-conspirators used. Moreover, Petitioner did not

object to them at trial. Petitioner also cannot show prejudice because a motion to suppress or a motion in limine would not have been successful given the relevance of the wiretap evidence. Even if some of this evidence had been limited, there was still overwhelming evidence of Petitioner's guilt based on statements from the other co-conspirators. Because Petitioner cannot show deficient performance or prejudice, this claim is denied. See Strickland, 466 U.S. at 687-88, 694.

   2. **Petitioner's contention that trial counsel was ineffective because she failed to present the wiretap discovery materials to him so he could listen to them to determine whether to plead guilty or go to trial.**

   Petitioner next asserts that he was unaware of the wiretap recordings until he heard them at trial. (Civ. Doc. No. 5-1 at 4 n.2). Petitioner asserts that counsel Jayne failed to present the wiretap discovery materials to him so he could listen to them to determine whether to plead guilty or go to trial. (Civ. Doc. No. 1 at 5). He contends that if he had heard the recordings, he would have requested a motion to suppress evidence of racial slurs and his political views,[5] and, if he had been unsuccessful, he would have accepted a fifteen-year plea deal that was offered to his other attorney (Peter Anderson). (Id. at 19 n.). He asserts that he originally rejected a plea deal because he thought the Government's case consisted only of witness testimony. (Civ. Doc. No. 5-1 at 4-5). He contends that his willingness to plead guilty is shown by the fact that he previously pleaded guilty in five other criminal cases. (Id. at 5).

   Petitioner's assertion that he was unaware of the wiretaps until he appeared at trial is belied by the fact that the wiretap evidence was discussed during the proceedings in which Petitioner first decided to proceed pro se; this information was in the Government's motion for

---

[5]   It is not clear from the wiretaps what Petitioner is referring to.

alternative production of discovery, which he was served with while he was proceeding pro se before trial; and Jayne informed him of the wiretap evidence and attempted to play it for him before trial. (Crim. Case No. 3:09-cr-39-FDW-5, Doc. No. 264 at 80, Doc. No. 256; Civ. Doc. No. 11-1 at ¶ 6). Rather than listening to the wiretaps, Petitioner began cursing and yelling, refused to listen, and declared that he was lead counsel. (Civ. Doc. No. 11-1 at ¶ 6). Petitioner cannot show deficient performance where counsel attempted to play the wiretaps, but where he prevented her from doing so. While Petitioner may not have heard the wiretaps before trial because of his refusal to listen to them, the evidence is clear that he was aware of them before trial. Indeed, he even suspected that phones were being tapped while he was still involved with the conspiracy.

Petitioner also cannot show prejudice. Given that most of the wiretaps were of conversations in which Petitioner participated, he had independent knowledge of the content and nature of the language used in his discussions with co-conspirators. His assertion that he would have pleaded guilty to a fifteen-year plea deal had he heard the wiretaps and unsuccessfully moved to suppress them is without merit. He was told of the incriminating nature of the evidence against him, including the statements of codefendants and police reports, yet he still chose to proceed to trial. (Id. at ¶ 5). He also has not met his burden to show that there was an outstanding fifteen-year plea offer that he could have accepted had he filed an unsuccessful motion to suppress. (Id. at ¶ 7). Furthermore, on January 20, 2010, Petitioner told his attorney that he would not agree to a plea deal in the case. (Id.). Thus, Petitioner has not shown that there is a reasonable probability that but for counsel's conduct, he would have pleaded guilty. Accordingly, Petitioner's assertion of ineffective assistance of counsel with respect to the wiretap evidence is denied. See Strickland, 466 U.S. at 687-88, 694.

**3. Petitioner's claim that counsel was ineffective for failing to investigate Kevin Mullis's background.**

Petitioner next argues that his attorney Jayne provided ineffective assistance by failing to investigate Mullis's background despite Petitioner's questioning the evidence obtained during the 2007 traffic stop. (Civ. Doc. No. 1 at 6-7; Civ. Doc. No. 5-1 at 6-8). He argues that if she had investigated Mullis's background, she would have discovered that he had aided and abetted a murder committed by his brother. (Civ. Doc. No. 1 at 6). Petitioner contends that this information could have been used to impeach Mullis's testimony at trial and that this "would have helped the Petitioner's defense tremendously at trial." (Id. at 7). He speculates that this "could have caused an impeachment spill-over to all other Officers who testified . . . ." (Civ. Doc. No. 5-1 at 7). Petitioner also argues that counsel could have discovered Mullis's conduct with respect to the missing evidence before trial. (Id. at 18-19).

Petitioner has not shown that counsel Jayne was deficient for failing to uncover Mullis's involvement after a murder was committed by his brother in 2000, conduct that occurred almost a decade before trial and for which Mullis was not charged. Jayne asserts in her affidavit that her customary practice includes investigating the background of government witnesses, including law enforcement officers, by looking at criminal records, other court involvement, and checking social media cites and certain databases. (Civ. Doc. No. 11-1 at ¶ 9). Jayne asserts that she did not find any basis for questioning Mullis's veracity at trial. (Id.). Given Jayne's assertions in her affidavit, and because Petitioner's allegations are based on speculation, the Court finds that Petitioner has not shown that Jayne's investigation was unreasonable. Furthermore, Petitioner's assertion that counsel could have discovered Mullis's conduct with respect to the missing evidence before trial is factually impossible, as the evidence was admitted at trial and did not go

missing until after trial.  Therefore, he has not shown deficient performance.  See Strickland, 466 U.S. at 687-88.

Furthermore, Petitioner cannot establish prejudice because there is no reasonable probability that the result of the proceeding would have been different had this evidence been admitted.  First, it is not clear the Court would have allowed cross-examination on this uncharged conduct under Federal Rules of Evidence 404(b) (prior bad acts), 608 (impeachment by inquiry into character for truthfulness), or 609 (requiring a criminal conviction).  See United States v. David, 78 F.3d 579, at *2 (4th Cir. 1996) (unpublished decision) (holding prior bad acts evidence was not admissible).  Second, even if this evidence had been admitted and was successfully used to impeach Mullis, because there was overwhelming evidence of Petitioner's guilt even without Mullis's testimony, there was no prejudice.  Accordingly, Petitioner has not shown ineffective assistance of counsel with respect to the investigation of Mullis.  See Strickland, 466 U.S. at 687-88, 694.  Accordingly, this claim of ineffective assistance of trial counsel is denied.

**B.  Petitioner's claims of ineffective assistance of appellate counsel.**

With regard to claims of ineffective assistance of counsel, courts should ordinarily only find ineffective assistance for failure to raise claims on appeal when "ignored issues are clearly stronger than those presented."  Smith v. Robbins, 528 U.S. 259, 288 (2000) (internal citation and quotation omitted).  Appellate counsel is not required to assert all non-frivolous issues on appeal.  Griffin v. Aiken, 775 F.2d 1226, 1235 (4th Cir. 1985).  Rather, winnowing out weaker arguments and focusing on more promising issues "is the hallmark of effective appellate advocacy."  Smith v. Murray, 477 U.S. 527, 536 (1986).  Thus, "[a] decision with respect to an appeal is entitled to the same presumption that protects sound trial strategy."  Pruett v.

Thompson, 996 F.2d 1560, 1568 (4th Cir. 1993). Additionally, the petitioner still bears the burden to show that there is a reasonable probability that, but for counsel's failure to raise an issue on appeal, the result of the proceeding would have been different, i.e., he would have prevailed on appeal. See Robbins, 528 U.S. at 285-86.

1. **Petitioner's claim that appellate counsel failed to challenge this Court's use of the proper standard when deciding the motion for a new trial.**

Petitioner first argues that his appellate counsel (Fisher) provided ineffective assistance by not arguing that this Court abused its discretion by denying his motion for a new trial under the incorrect legal standard. (Civ. Doc. No. 1 at 7-8, 14-15; Civ. Doc. No. 5-1 at 8). Petitioner asserts that he did not need to meet all five prongs under Bales and that he made a strong showing that there was evidence that would have acquitted him at trial. (Civ. Doc. No. 1 at 7). He cites this Court's statement with respect to the missing trial exhibits that "I can't say there's no bad faith" and "it probably would have been strong impeachment information." (Id. at 7-8). He also contends that the newly discovered evidence should have been disclosed under Brady v. Maryland, 373 U.S. 83 (1963). (Id. at 14).

Pursuant to Brady, and Giglio v. United States, 405 U.S. 150 (1972), the Government has a duty to disclose favorable evidence, including impeachment evidence, that is material to guilt or punishment. Evidence is material if it creates "a 'reasonable probability' of a different result." Kyles v. Whitley, 514 U.S. 419, 434 (1995) (quoting United States v. Bagley, 473 U.S. 667, 678 (1985)). The Government has no duty to disclose information it does not know about or possess. See United States v. Capers, 61 F.3d 1100, 1103 (4th Cir. 1995) (holding there was no suppression of notebook destroyed by a prosecution witness where Government did not know about the notebook); United States v. Atkinson, 512 F.2d 1235, 1239 (4th Cir. 1975) (rejecting

Giglio claim based on background information defendant alleged the Government should have discovered).

Here, the Government did not suppress any favorable or impeachment evidence. The trial exhibits did not go missing until after trial, and the Government was not informed that Mullis was being investigated regarding missing evidence until late April 2012. See United States v. Jones, 399 F.3d 640, 647 (6th Cir. 2005) (holding that Brady material must exist at the time of trial). After more investigation confirmed that trial exhibits 28A and 28B were missing, the Government notified the defense and this Court on June 5, 2012. Mullis's involvement in the 2000 investigation of his brother occurred before he became a law enforcement officer and was not disclosed to the Government, despite a pre-trial request for Giglio material. See (Crim. Case No. 3:09-cr-39-FDW-5, Doc. No. 712 at 9). This evidence was not disclosed to the Government until April 2012, and the Government timely disclosed this information to the defense. See (Civ. Doc. No. 9-2 at ¶ 4; Crim. Case No. 3:09-cr-39-FDW-5, Doc. No. 732 at 42). Accordingly, the Government promptly disclosed all evidence of misconduct after becoming aware of it, even though Petitioner had already been convicted at trial. Thus, there was no Brady violation, so Petitioner's assertion that the standard in United States v. Cohn, 166 F. App'x 4, 12 (4th Cir. 2006) (applying a more favorable standard where the motion for a new trial is based on a violation of Brady), should have been applied to his motion for a new trial is meritless. See United States v. Robinson, 627 F.3d 941, 949 (4th Cir. 2010) (rejecting the petitioner's claim that he should have received a new trial after police misconduct that occurred before trial was discovered after trial, and noting that it was generally reluctant "to order retrials because of subsequently discovered impeachment evidence").

Petitioner also cannot show prejudice from counsel's failure to appeal the standard applied by this Court in reviewing the motion for a new trial. First, the motion for a new trial and Mullis's testimony did not impact any of the evidence used to support Petitioner's conviction for conspiracy to commit a Hobbs Act robbery. Rather, it was relevant only to his drug conspiracy conviction. Under Fourth Circuit law, a new trial may be granted where there is a Brady violation "even though the new evidence is merely impeaching" if disclosure of the evidence "would result in a reasonable probability of a different result." Cohn, 166 F. App'x at 12. That is, the evidence must "'undermine[] confidence in the outcome of the trial.'" Id. (quoting Kyles, 514 U.S. at 434). Even if counsel had argued that this standard applied, it could only have applied to the 2000 impeachment evidence. Furthermore, given the insignificance of Mullis's testimony in light of the overwhelming evidence of Petitioner's guilt, there is no reasonable probability that such a challenge would have changed the result on appeal because the motion for a new trial would have failed under either standard in light of this Court's finding that Mullis's testimony had no impact on the jury's verdict. (Crim. Case No. 3:09-cr-39-FDW-5, Doc. No. 732 at 41). Therefore, counsel was not ineffective for failing to argue on appeal that the wrong standard was used to decide Petitioner's motion for a new trial.

**2. Petitioner's claim that appellate counsel provided ineffective assistance with respect to his motion for a new trial regarding Mullis.**

Petitioner next argues that appellate counsel (Craven) provided ineffective assistance with respect to his motion for a new trial regarding Mullis. (Civ. Doc. No. 5-1 at 9-18). In particular, Petitioner argues that counsel should have investigated the 2007 evidence log to determine whether Mullis had ever logged the evidence obtained from the traffic stop into the evidence room and that counsel should have objected to the Court's use of the Bales test in

evaluating the motion. (Id.). Petitioner speculates that such an investigation would have shown that Mullis destroyed the records and the evidence to cover-up the fact that he had fabricated the paperwork. (Id. at 11). Petitioner also contends that Mullis's testimony at trial was key because the remaining witnesses were "jailhouse" witnesses and the other officers who testified where only providing general information about policies and procedures. (Id. at 14-16).

Because it is a collateral proceeding, there is no Sixth Amendment right to counsel in litigating a motion for a new trial that is based on newly discovered evidence and is filed more than fourteen days after the district court's judgment is entered. United States v. Williamson, 706 F.3d 405, 417 (4th Cir. 2013). A defendant cannot be deprived of effective assistance of counsel where he has no constitutional right to counsel. Coleman v. Thompson, 501 U.S. 722, 752 (1991). Accordingly, this claim is dismissed. Moreover, as the Government notes, even if this claim could be addressed, it is pure speculation that Mullis fabricated the evidence. Moreover, this speculation is belied by the testimony from Campbell and Billings that Petitioner was arrested after flex was found in the car he was driving, this physical evidence was examined and tested by the SBI lab, and the evidence was presented at trial. Even without the drug evidence found during the 2007 traffic stop, Petitioner would have been convicted based on the other evidence presented. Thus, his motion for a new trial would have been denied under any standard. Accordingly, Petitioner cannot establish that he received ineffective assistance in litigating his motion for a new trial.

**3. Petitioner's claim that his appellate attorneys were ineffective for failing to raise a claim of prosecutorial misconduct.**

To establish prosecutorial misconduct, a defendant must demonstrate: (1) that the prosecutor's conduct was improper, and (2) that the improper conduct prejudicially affected the

defendant's substantial rights so as to deprive him of a fair trial.  See United States v. Mitchell, 1 F.3d 235, 240 (4th Cir. 1993).  Petitioner argues that appellate counsel should have raised the issue of prosecutorial misconduct in his first and second appeals.  (Civ. Doc. No. 1 at 8-9; Civ. Doc. No. 5-1 at 17-18).  He contends that counsel should have requested an evidentiary hearing, including a polygraph test, to determine whether AUSA Ferry had made any materially false statements of fact regarding the discovery of misconduct in this case.  (Civ. Doc. No. 1 at 8-9).  He contends that AUSA Ferry had a duty to know "about every witness['s] criminal history before he or she takes the stand . . . ."  (Id. at 9, 11-13).  He argues that if Ferry knew during trial about Mullis's role in the 2000 murder, then his Fifth Amendment rights were violated because she knew that Mullis perjured himself by "testifying about the alleged drugs seized from the Petitioner" and did not notify the defense.  (Id. at 9).  Petitioner asserts that he "believes" that AUSA Ferry knew before and during trial about Mullis's involvement in the 2000 murder and that she knew that Mullis committed perjury at trial when he testified regarding the drugs seized from Petitioner.  (Id. at 13, 16-17).  Petitioner conjectures that Mullis later stole and destroyed these drugs.  (Id. at 13).

Petitioner's argument is based on pure speculation.  See Dyess, 730 F.3d at 359-60; Hughes v. Johnson, 191 F.3d 607, 629-30 (5th Cir. 1999) (holding a Brady claim may not be based on speculation).  He points to no evidence that the prosecutor was aware of any misconduct before or during trial, nor does he offer any support for his contention that Mullis's misconduct shows that he perjured himself when testifying at trial.  Indeed, Petitioner's assertions are contradicted by the record, which shows that the exhibits did not go missing until after trial, and the Government was not notified of the 2000 investigation until April 2013.  Defense counsel also conceded that the Government revealed the information regarding the 2000

investigation "very, very quickly." (Crim. Case No. 3:09-cr-39-FDW-5, Doc. No. 732 at 42). Furthermore, this Court has already determined, in denying Petitioner's motion for a new trial, that there was no prosecutorial misconduct. (Id. at 41-43).

Mullis's involvement in the 2000 murder investigation occurred almost a decade before trial and before he became a law enforcement officer. The Government requested Giglio information from Mullis before trial, but he did not disclose this information. The Government disclosed this information to the defense promptly upon becoming aware of it. The Government did likewise with respect to the post-trial loss of exhibits. Thus, there was no improper conduct.

Moreover, even if Petitioner could have shown improper conduct, he cannot show that any disclosures relating to Mullis prejudicially affected his substantial rights so as to deprive him of a fair trial because the evidence provided by Mullis had no impact on the jury's verdict in light of the overwhelming evidence of Petitioner's guilt given the testimony of co-conspirators and witnesses, as well as the wiretap evidence where the jury heard Petitioner's voice conducting drug transactions and planning a violent robbery. See Mitchell, 1 F.3d at 240. Because there is no evidence of prosecutorial misconduct, Petitioner cannot show that his appellate counsel was deficient or that he was prejudiced by the failure to raise this issue on appeal. See Robbins, 528 U.S. at 285-86, 288.

4. **Petitioner's claim that his appellate attorneys were ineffective for failing to raise the preservation of evidence on appeal.**

Petitioner next asserts that his appellate attorneys should have raised preservation of evidence as an issue on appeal. (Civ. Doc. No. 1 at 9-10). He claims that he complained at trial and during his resentencing that Mullis had planted the drugs that were seized from him in 2007. (Id.). He contends that this Court stated at resentencing that this was an issue that could have

been raised during the original appeal.  (Id. at 10).  He asserts that the failure to raise this issue prejudiced him, but he does not specify how.  (Id.).

The duty to preserve evidence is "limited to evidence that might be expected to play a significant role in the suspect's defense."  California v. Trombetta, 467 U.S. 479, 488 (1984).  Thus, "the evidence must both possess an exculpatory value that was apparent before the evidence was destroyed, and be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means."  (Id. at 489).  Drug evidence that has been tested and found to be an illegal substance is not material exculpatory evidence.  Illinois v. Fisher, 540 U.S. 544, 548 (2004).  At most, a defendant could hope that had the evidence been tested again the result might have exonerated him, which would make the evidence potentially useful.  Id. at 547.  The failure to preserve "'potentially useful evidence' does not violate due process 'unless a criminal defendant can show bad faith on the part of the police.'"  Id. at 547-48 (quoting Arizona v. Youngblood, 488 U.S. 51, 58 (1988)).  To establish bad faith, an officer must have "intentionally withheld the evidence for the purpose of depriving the plaintiff of the use of that evidence during his criminal trial."  United States v. Fridie, 442 F. App'x 839, 842 (4th Cir. 2011) (quoting Jean v. Collins, 221 F.3d 656, 663 (4th Cir. 2000)).

Here, counsel was not deficient for failing to challenge the post-trial preservation of evidence that was not exculpatory, but was, at most, potentially useful.  Petitioner conjectures that Mullis planted the drug evidence in his car.  However, no additional testing of this evidence would establish this allegation.  He also speculates that Mullis wanted to take money from Petitioner but, again, Petitioner does not tie this to what additional testing of the evidence would have shown.  Thus, he has not shown that the evidence was potentially useful in establishing a defense.  Unlike in Fisher, where the bag of drug evidence was destroyed before trial and was the

only evidence supporting the charge of drug possession, here the evidence went missing after trial, so Petitioner was not deprived of its use at trial. Rather, Petitioner had the opportunity to question both Mullis and the person who conducted the state crime lab tests, regarding the exhibits. Additionally, there was ample other evidence of Petitioner's trafficking in cocaine. Thus, counsel's decision not to raise this issue on appeal was objectively reasonable. See Pruett, 996 F.2d at 1568; Ferguson v. Roper, 400 F.3d 635, 638 (8th Cir. 2005) (rejecting application of Youngblood to evidence lost or destroyed after trial); see also Lovitt v. True, 403 F.3d 171, 187 (4th Cir. 2005) (intimating that extending the Youngblood rule beyond the pretrial setting in a habeas case might violate the rule against using habeas corpus to create new rules of constitutional procedure).

Additionally, this claim fails because Petitioner fails to allege or show prejudice. Even if Petitioner could show that the evidence was potentially useful, he cannot show that the evidence was destroyed in bad faith. Here, the federal government had requested the preservation of the trial exhibits, see Crim. Case No. 3:09-cr-39-FDW-5, Doc. No. 712 at 5, but the exhibits were lost while in the possession of state authorities. See United States v. Henderson, 41 F. App'x 651, 652 (4th Cir. 2002) (holding there was no evidence of bad faith where the federal government had nothing to do with the state's inadvertent destruction of evidence). As this Court previously found, there was insufficient evidence to make a finding of bad faith with respect to the missing evidence. (Crim. Case No. 3:09-cr-39-FDW-5, Doc. No. 732 at 29-32). In the absence of evidence of bad faith, Petitioner cannot show deficient performance or prejudice from counsel's failure to challenge the preservation of evidence on appeal, as there is no reasonable probability of a different result. Robbins, 528 U.S. at 285-86.

**C. Petitioner's claim of prosecutorial misconduct.**

Petitioner also raises a free-standing claim of prosecutorial misconduct, arguing that the prosecutor should have known about Mullis's background and should have disclosed this information to the defense before trial. (Civ. Doc. No. 1 at 10-13). He also speculates, without support, that Mullis testified falsely regarding the drugs seized during the 2007 traffic stop and that the prosecutor knew that this testimony was false. (Id. at 13).

A § 2255 motion is not a substitute for a direct appeal and does not provide an opportunity to re-try a case. Varela v. United States, 481 F.3d 932, 935 (7th Cir. 2007). Claims of error that could have been raised on direct appeal, but were not, are procedurally barred unless the petitioner shows both cause for the default and actual prejudice, or demonstrates that he is actually innocent of the offense. See Bousley v. United States, 523 U.S. 614, 621-22 (1998); United States v. Bowman, 267 F. App'x 296, 299 (4th Cir. 2008). "[C]ause for a procedural default must turn on something external to the defense, such as the novelty of the claim or a denial of effective assistance of counsel." United States v. Mikalajunas, 186 F.3d 490, 493 (4th Cir. 1999).

Here, Petitioner's assertion of prosecutorial misconduct is procedurally barred because he could have raised this claim in his second appeal, and he has not shown ineffective assistance of counsel from failing to raise this claim. Even if not procedurally barred, Petitioner's assertion that Mullis testified falsely and that the prosecutor knew this is speculative and unsupported. See Dyess, 730 F.3d at 359-60. His claim of prosecutorial misconduct is denied because this Court has already determined that there was no prosecutorial misconduct stemming from the disclosure of Mullis's misconduct. See (Doc. No. 732 at 41-43).

Moreover, there is no evidence of improper conduct or that Petitioner's substantial rights were affected. See Mitchell, 1 F.3d at 240. The prosecutor asked Mullis whether he had any

<u>Giglio</u> evidence to disclose, and he responded negatively. (Crim. Case No. 3:09-cr-39-FDW-5, Doc. No. 712 at 9). The prosecutor was not made aware of the 2000 murder investigation until March 2013. (No. 9-2). Thus, there is no basis for Petitioner's assertion that the prosecutor knowingly failed to disclose this evidence. Likewise, the record is clear that exhibits 28A and 28B were available before and at trial, and these exhibits were not lost until after Petitioner was convicted. Again, the prosecutor timely notified the defense of the missing evidence. (Civ. Doc. No. 1 at 27-28). Thus, there was no improper conduct.

Nor can Petitioner meet his burden to show that any improper conduct prejudicially affected his substantial rights so as to deprive him of a fair trial. Even if all of Mullis's testimony was discredited, this would not have led to a reasonable probability of a different result. Overwhelming evidence of Petitioner's cocaine dealings and plan to rob a drug dealer's home was presented through witnesses and wiretap evidence. Mullis's testimony had no effect on the verdict. <u>See</u> (Crim. Case No. 3:09-cr-39-FDW-5, Doc. No. 732 at 41). Accordingly, Petitioner's claim of prosecutorial misconduct is meritless. <u>See</u> <u>United States v. Williams</u>, 392 F. App'x 194, 196 (4th Cir. 2010) (holding improper conduct did not affect substantial rights were there was overwhelming evidence of guilt).

### D. Petitioner's assertions of police misconduct and improper destruction of evidence.[6]

Petitioner next argues that Mullis planted drug evidence in his case related to the 2007 traffic stop so he could take Petitioner's money. (Civ. Doc. No. 1 at 15). He contends that Mullis intentionally destroyed this evidence, and the evidence log, despite an order to preserve it.

---

[6] This claim also lists an "Equal Protection Violation," but Petitioner has not presented an argument as to this purported claim and it is therefore deemed abandoned.

(Id.).    He asserts that this evidence was destroyed in bad faith, but that he was not required to

show bad faith because the exculpatory value of the evidence was known at the time of its

destruction.  (Id.).  These claims are procedurally barred due to Petitioner's failure to raise them

on appeal.  See Bousley, 523 U.S. at 621-22.  He cannot overcome the procedural bar because, as

discussed above, there was no ineffective assistance with respect to raising these issues.  See

Mikalajunas, 186 F.3d at 493.  Petitioner's claims also fail because, as discussed above in his

ineffective assistance claim, the evidence was not exculpatory, and he has not shown bad faith.

The Court notes that, in a motion to supplement, filed on July 1, 2016, Petitioner seeks to

supplement the record by adding an order, dated June 17, 2016, from the Anson County Superior

Court vacating Petitioner's 2008 North Carolina conviction for misdemeanor possession of drug

paraphernalia.  See (Civ. Doc. No. 24).  The facts underlying the state court conviction arose out

of the traffic stop in 2007, which this Court has previously discussed, in which North Carolina

state trooper Mark Stewart stopped Petitioner's vehicle for speeding, while Jawaad Nash, Eric

Sutton, and Eugene Langley were also in the vehicle.  (Crim. Case No. 3:09-cr-39-FDW-5, Doc.

No. 586 at 136-39).  (Id. at 145).  Mullis and two other officers responded to a call for backup.

(Id. at 138-39, 142-43, 145-46).  Mullis and an Anson County sheriff's deputy searched the

vehicle and found a small amount of cocaine and some flex.  See (Id. at 146-50, 168, 170).

Based on these events, Petitioner was convicted in state court of misdemeanor possession of drug

paraphernalia in March 2008 and was sentenced to 32 days of confinement.  (Civ. Doc. No. 23 at

33).

In 2015, Petitioner filed a motion for appropriate relief in state court, arguing that his

conviction should be vacated because Mullis had purportedly planted the evidence against him

and the prosecutor would have known about Mullis's involvement with his brother's murder case

and would have disclosed this information. (Id. at 29-31). He also cited the loss of the evidence in this federal case. (Id.). The State responded to the motion, noting that Mullis no longer worked for the Lilesville Police Department and stating that if a motion for a new trial was granted, the State would not call Mullis as a witness, but would move to dismiss the charges against Petitioner. (Id. at 34). The State admitted that it had become aware of evidentiary issues and that grounds existed for granting the motion for appropriate relief. (Id. at 33-34). The state court granted Petitioner's motion for appropriate relief and vacated the judgment. See (Civ. Doc. No. 24 at 2).

Petitioner now wishes to supplement his motion to vacate with the state court's vacatur, as he contends that the vacatur supports his allegation that Mullis planted evidence in this case. Although the Court grants Petitioner's motion to supplement, and Court finds that the state court vacatur of Petitioner's 2008 North Carolina conviction does not alter the Court's conclusion that Petitioner is not entitled to relief. First, as this Court has already discussed, the evidence provided by Mullis did not impact the jury's verdict in light of the overwhelming evidence of Petitioner's guilt given the testimony of co-conspirators and witnesses, as well as the wiretap evidence through which the jury heard Petitioner's voice conducting drug transactions and planning a violent robbery. See (Crim. Case No. 3:09-cr-39-FDW-5, Doc. No. 732 at 39-41). Second, evidence that Petitioner was convicted of the state charge of possession of drug paraphernalia was not presented during his federal trial. Rather, the Government presented evidence of the traffic stop to show Petitioner's association with the co-conspirators in this case. See (Id. at 135).

Third, contrary to Petitioner's assertion, the factual findings in the state court's order vacating Petitioner's conviction do not establish that Mullis planted evidence against Petitioner.

The fact that the State chose to agree to dismiss the charges rather than attempt to re-try Petitioner for a misdemeanor conviction, for which he received a 32-day sentence, also does not establish that any evidence was planted, particularly where the evidence is missing, a primary witness no longer works for the police department, and Petitioner is serving a long federal sentence out-of-state. In other words, the State's consent to granting the motion for appropriate relief does not indicate that the State believed or had any evidence to show that Mullis planted evidence. Moreover, there is independent evidence that the cocaine and flex were not planted in Petitioner's car while four law enforcement officers were on the scene. See (Id. at 13-15, 136-39, 145-46, 204). Jason Campbell testified that Sutton, who was in the car with Petitioner at the time of the traffic stop, told Campbell that Petitioner had some fake dope and had started to eat it when they got pulled over. (Id. at 13-15). Malik Billings also testified that after the stop he had to pick up Sutton, Nash, and Langley, and they told him that Petitioner had been pulled over for speeding and that the police had found flex in the car (not that police had planted flex in the car). (Id. at 204). In short, the record establishes that the Government presented overwhelming evidence of Petitioner's guilt of the charges against him. Mullis's testimony and the evidence from the traffic stop did not impact the jury's finding of guilt. Accordingly, the vacatur of Petitioner's state misdemeanor conviction stemming from this traffic stop does not alter the Court's determination that Petitioner is not entitled to relief on his motion to vacate.

**E. Petitioner's claim of cumulative error.**

As his final claim, Petitioner contends that the errors by counsel cumulatively amount to ineffective assistance. Claims of ineffective assistance of counsel must be evaluated individually, not cumulatively. Fisher v. Angelone, 163 F.3d 835, 852-53 (4th Cir. 1998). Because Petitioner has not established deficient performance and prejudice as to any of his

ineffective assistance claims, he cannot show cumulative error based on ineffective assistance. See id. Generally, if none of a defendant's claims warrant relief individually, a court will not reverse for cumulative error. United States v. Basham, 561 F.3d 302, 330 (4th Cir. 2009). However, a court may find cumulative error if other individually harmless errors "'so fatally infect the trial that they violated the trial's fundamental fairness.'" Id. (quoting United States v. Bell, 367 F.3d 452, 471 (5th Cir. 2004)). Here, because Petitioner has not shown any error, his assertion that he is entitled to relief based on cumulative error is denied.

**IV. CONCLUSION**

For the foregoing reasons, the Court denies and dismisses Petitioner's § 2255 petition.

**IT IS, THEREFORE, ORDERED** that:

1. Petitioner's Motion to Vacate, Set Aside or Correct Sentence under 28 U.S.C. § 2255, (Doc. No. 1), is **DENIED** and **DISMISSED**.

2. Petitioner's "Motion to Amend/Correct Motion to Vacate/Set Aside/Correct Sentence," (Doc. No. 5), and Petitioner's "Notice of Exhibit and Motion to Supplement, (Doc. No. 24), are **GRANTED** to the extent that the Court has considered the additional arguments in Petitioner's motions.

3. **IT IS FURTHER ORDERED** that pursuant to Rule 11(a) of the Rules Governing Section 2254 and Section 2255 Cases, this Court declines to issue a certificate of appealability. See 28 U.S.C. § 2253(c)(2); Miller-El v. Cockrell, 537 U.S. 322, 338 (2003) (in order to satisfy § 2253(c), a petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong); Slack v. McDaniel, 529 U.S. 473, 484 (2000) (when relief is denied on procedural grounds, a petitioner must

establish both that the dispositive procedural ruling is debatable and that the

petition states a debatable claim of the denial of a constitutional right).

Signed: January 11, 2017

Frank D. Whitney
Chief United States District Judge